

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-08-00176-CR
_____

DETWONNE MONSHAY ALEXANDER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Sixth Judicial District Court
Lamar County, Texas
Trial Court No. 22531

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

At Detwonne Monshay Alexander's jury trial in Lamar County leading to his conviction[1] for delivery of a controlled substance—cocaine between four and 200 grams—in a drug free zone, Alexander wanted to prominently display a Bible on counsel table in view of the jury, but was directed by the trial court to keep it in a less prominent position. In this appeal, Alexander asserts that he was improperly denied his constitutional right to exercise his religion and that he was convicted on insufficient evidence corroborating accomplice-witness testimony.

We affirm the trial court's judgment because (1) the trial court did not abuse its discretion in directing Alexander to move his Bible and (2) sufficient evidence corroborates the accomplice-witness testimony.

*(1)     The Trial Court Did Not Abuse Its Discretion in Directing Alexander to Move His Bible*

Alexander began trial with his Bible on the counsel table in front of him. When the State objected, the trial court ordered it put away. Alexander asserts that, in that respect, the trial court erred and thus infringed his right to the free exercise of his religion. We disagree.

We analyze questions committed to the trial court's exercise of discretion by inquiring whether the trial court acted without reference to guiding rules and principles or, stated otherwise, whether the court acted arbitrarily or unreasonably.[2] *See Lyles v. State*, 850 S.W.2d 497, 502 (Tex.

---

[1]Alexander was sentenced to sixty years' imprisonment.

[2]*See Geders v. United States*, 425 U.S. 80, 86–91 (1976) (abuse-of-discretion standard applies because trial court "must meet situations as they arise and to do this must have broad power

2

Crim. App. 1993). If a trial court's discretionary ruling falls "within the zone of reasonable disagreement," we must affirm. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002); *Allen v. State*, 232 S.W.3d 776, 781 (Tex. App.—Texarkana 2007, no pet.).

We are required to uphold a decision by a trial court not just on the rationale given for that decision, but on any lawful basis that justifies that decision. We may uphold a trial court's ruling on any legal theory or basis applicable to the case, but may not reverse a trial court's ruling on any theory or basis that might have been applicable to the case, but was not raised. *Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002); *cf. Cameron v. State*, 241 S.W.3d 15, 18–20 (Tex. Crim. App. 2007). Thus, if we find that the trial court's decision, to have Alexander move the Bible, is supportable for any reason, we will find no error.

Certainly, symbolism is found in and around our courtrooms, and trial courts have the discretion to allow displays so long as they are not prejudicial to a litigant. *See Davis v. State*, 223 S.W.3d 466, 475 (Tex. App.—Amarillo 2006, pet. ref'd) (no prejudice shown in trial court's allowing trial spectators to wear medallions bearing photograph of victim police officer); *Green v. State*, 209 S.W.3d 831, 834 (Tex. App.—Amarillo 2006, pet. ref'd) (trial court permissibly allowed small, unobtrusive cross pendant to be worn by prosecutor); *Ruckman v. State*, 109 S.W.3d 524, 532 (Tex. App.—Tyler 2000, pet. ref'd) (within trial court's discretion to allow district attorney and assistant district attorney, during trial, to wear lapel pins supporting children).

---

to cope with the complexities and contingencies inherent in the adversary process").

The trial court has "the inherent power to control the orderly proceedings in the courtroom . . . ." *Allen*, 232 S.W.3d at 780; *Gonzales v. State*, 2 S.W.3d 600, 607 (Tex. App.—Texarkana 1999, pet. ref'd); *see Geders*, 425 U.S. at 86. Trial courts have the power and obligation to control their courtrooms for the purposes of ascertaining the truth, promoting judicial economy, and protecting witnesses. Trial courts must have certain authority over their courtrooms, sufficient to

> exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

TEX. R. EVID. 611(a). Litigants have the right to have cases decided based on the evidence adduced at trial, not on some other basis. *See Holbrook v. Flynn*, 475 U.S. 560, 570 (1986); *Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996).

That inherent trial-court power includes restricting conduct or displays that might detract from an orderly, impartial trial focused on the issues to be tried and the legitimate evidence. In an unpublished opinion from Minnesota, a trial court was faced with a similar display of a Bible. That court reasoned that,

> the district court is charged with restricting disruptive conduct at trial, including the regulation of religious displays. A compelling interest of conducting a trial in a secular, impartial, orderly manner justified the district court's order. Because the district court inquired into the purpose of the Bible, had a compelling interest in conducting an orderly, impartial trial, and allowed appellant to hold the Bible in his lap, the district court did not err in ordering appellant to conceal his Bible.

4

*State v. Albertson*, No. A04-2277, 2006 Minn. App. Unpub. LEXIS 195, at *2–6 (Minn. Ct. App. Feb. 28, 2006).

Similarly, in a 1971 case from Florida, a trial court (reasoning that it would introduce an extraneous factor into the trial) declined to allow a defendant to keep a Bible on the table, noting that he had developed his interest in religion only after being incarcerated. The court also allowed the defendant to keep the Bible within his grasp, though requiring him to keep it out of sight. *Caldwell v. State*, 243 So. 2d 422, 424 (Fla. Dist. Ct. App. 1971).

On the other hand, a trial court in Ohio was unimpressed with such an objection by the State and responded differently: "I'm not going to order that a defendant can't have a Bible in the courtroom." The objection was overruled, and the trial resumed, with no apparent negative effect. *State v. Jackson*, No. L-07-1184, 2008 Ohio App. LEXIS 1344, at *P18 (Ohio Ct. App. Mar. 31, 2008). Generally, either position—allowing any particular, nongermane display or restricting it—is within the sound discretion of the trial court in the control of trial proceedings.

Here, the trial court did not deny Alexander the opportunity to have his Bible near him or even to read or refer to it if needed during trial. The court merely directed him to keep the Bible in a place less visible than on top of counsel table. In doing so, the trial court acted within its inherent authority to conduct orderly, impartial trial proceedings.

To justify a substantial interference with religious beliefs or practices, the government must show that it has a compelling interest in doing so. *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972);

5

*In re R.M.*, 90 S.W.3d 909, 912–13 (Tex. App.—San Antonio 2002, no pet.). Alexander suggests that the trial court's directive was a substantial interference with Alexander's First Amendment right to the free exercise of his religion. We disagree.

Because the record does not demonstrate how the trial court's order interferes with Alexander's free exercise of religion at all, much less "substantially," this complaint must fail. In 2002, our sister court of appeals in San Antonio was faced with a claim that an order requiring R.M. to submit to psychoactive medications would interfere with her religious beliefs. The court examined the testimony in the record and determined that, while R.M. testified she was "very religious and a devout Catholic" and taking the medication interfered with her reading, writing, or working to make money—which could be used to get music lessons to help her minister in song—that evidence failed to prove the medications would substantially burden R.M.'s free exercise of religion. *See id.* This record contains no evidence of any burden on Alexander's free exercise of religion.

Without proof to the contrary, simply displaying a Bible on the counsel table does not constitute the "exercise" of religion. This act is nothing more than a particular, easily recognized book being prominently displayed to jurors.

We also do not see that this is an issue about the Bible, in particular, or the free exercise of religion, in general. Imagine that a significant portion of the local population, in the county where

6

trial was being held, highly esteemed the *Boy Scout Handbook*,[3] which, by its cover, was easily recognizable by most jurors at a distance. Imagine further that the State's attorney, a former Boy Scout, wanted to display his well-worn *Boy Scout Handbook* prominently on counsel table, in a jury trial that did not particularly involve that book. Contents of the Handbook could very well be helpful in guiding the State's attorney in acting admirably and with virtue, if he used the Handbook's teachings. But would the trial court have the discretion to require the State's attorney to put the book in a less prominent position so as not to risk improperly influencing the jury? Undoubtedly. In doing so, would the trial court in any way interfere with the State's attorney's right to conduct himself according to the teachings of the Handbook? Certainly not.

The record contains no showing that Alexander's religious practices or beliefs required him to prominently display his Bible during trial. Nor is there any evidence that he had it for reference or even for comfort. The record suggests only that he wished to display it passively to the jury.

Further, the record suggests that the trial court's order did not deny Alexander access to his Bible any time he wanted to use it conventionally, rather than as a mute statement to the jury. The order was issued for the purpose of conducting an orderly trial, so that the jury would be uninfluenced by factors external to the evidence adduced.

---

[3]The Court should not be misunderstood as saying that the Bible is equivalent to the *Boy Scout Handbook*, though both are highly valued by many in our society and contain excellent teachings. The Court is simply attempting to analogize.

Alexander asserts that the effect of the order was to make him choose between the exercise of two constitutional rights: his right to remain silent and his right to exercise his religious beliefs. The State argued that displaying a Bible on the table in front of Alexander equated to testimony; thus, the State suggested, with some level of concurrence by the trial court, that displaying the Bible that prominently might have waived Alexander's Fifth Amendment right to remain silent. We see no possibility of waiver here.

An effective waiver of a fundamental constitutional right requires an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *In re Bryan*, 645 F.2d 331, 333 (5th Cir. 1981). "Courts indulge every reasonable presumption against waiver of a fundamental right . . . ." *United States v. Shea*, 508 F.2d 82, 85 (5th Cir. 1975).

Implicit, or "testimonial," waiver of the privilege against self-incrimination can be inferred from a witness' prior statement concerning the subject matter in question, but such waiver will not lightly be inferred and will be resisted by every reasonable presumption. *Klein v. Harris*, 667 F.2d 274, 287 (2d Cir. 1981) (citing *Emspak v. United States*, 349 U.S. 190, 198 (1955); *Smith v. United States*, 337 U.S. 137, 150 (1949)). Even if display of a Bible could be considered Alexander's "statement," it could not be considered to be a statement on the subject matter of the trial.

One could as well argue that it was testimony for the defendant to wear a particular type of clothing, or as suggested by appellate counsel, to have a particular type of facial hair, or a pony tail.[4] Testimony, by definition, is sworn, oral communication made by a witness at trial, or in affidavit or deposition. *See* BLACK'S LAW DICTIONARY 1514 (8th ed. 2004). The presence of a book on counsel table does not constitute testimony. Thus, the court's directive based on that theory is not supportable.[5]

The State has directed our attention to an unpublished Minnesota appellate decision as support for its position. *See Albertson*, 2006 Minn. App. Unpub. LEXIS 195, at *2–6. The case is not on point. Although the facts are quite similar, *Albertson* does not stand for the proposition that display of the Bible constituted some form of testimony. In that case, a trial court refused to allow a defendant to keep his Bible in a visible location, but not on the basis that it constituted testimony.

This instance of the trial court's control of its courtroom is within its sound discretion. Finding no abuse of the trial court's discretion, we overrule this point of error.

---

[4]Almost invariably, when police officers appear in court, either testifying or as interested observers, they appear in their uniforms. Under the State's argument in this case, one could equally take the position that their appearance in such specific and identifiable clothing constitutes a form of testimony. We also agree with Alexander's suggestion that a defendant priest would surely not be required to remove his clerical collar, or a rabbi his yarmulke. Although such a display would reflect a religious belief, it is simply not testimony for Fifth Amendment purposes.

[5]Long-standing caselaw holds that a person may not be required to surrender one constitutional right to assert another. *Simmons v. United States*, 390 U.S. 377, 394 (1968); *Avila v. State*, 856 S.W.2d 260, 261 (Tex. App.—El Paso 1993, pet. ref'd).

*(2)*    *Sufficient Evidence Corroborates the Accomplice-Witness Testimony*

Alexander also contends the evidence is insufficient to support his conviction because the testimony of Brittany Brown, an accomplice, was not adequately corroborated.

The test for adequate corroboration is whether, after excluding the accomplice's testimony, there is other evidence of an incriminating character which tends to connect the defendant with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The other evidence needs only to link the accused to the commission of the crime and allow "rational jurors [to] conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Malone v. State*, 253 S.W.3d 253 (Tex. Crim. App. 2008).

The record reveals this story. Confidential informant, K.H., was wearing a "wire" and was to make a drug buy from Brown. K.H. and Brown met at a local store and together drove to a roadside rendezvous point, where a person in a gold Chevrolet Suburban met them. Brown went to the passenger seat of the Suburban, and the occupant of the Suburban gave her a single bag containing what was later proven to be cocaine. As the Suburban pulled away and police attempted to stop the vehicle, Brown went the opposite direction. Brown returned to K.H.'s home, and police met them there.

Brown, found by the trial court to be an accomplice, gave authorities the cocaine and identified Alexander as the driver of the Suburban, that is, the seller of the cocaine. When police stopped the Suburban, its driver got out and successfully eluded police.

10

The question before us is whether sufficient evidence, beyond Brown's testimony, connects Alexander to the sale of cocaine.

The Suburban was registered to Alexander and his wife, Lameca Edwards. The officer who stopped the vehicle, David Rowton, said that its driver met the general physical description of Alexander, but that he could not positively identify him.

The police also recovered a cell phone that was left in the Suburban. Edwards was the telephone's owner. Edwards' cell phone memory indicated several calls received from Brown's cell phone and several text messages matching text messages on Brown's telephone, the most crucial of which occurred during the time period that K.H. and Brown were together the evening of the offense. The relevant text messages compiled from the telephones tell the story of the text messages sent and received between Brown's telephone and Edwards' telephone between 8:09 p.m. and 8:34 p.m. the evening of the drug buy in question:

From Brown at 8:09 p.m.: "Are u almost ready"

To Brown at 8:10 p.m.: "Yeah"

From Brown at 8:16 p.m.: "When we meet im gettin in with u becuz me and this other girl from work are gettin this together where u want to meet me"

To Brown at 8:17 p.m.: "Ok.who u wth"

From Brown at 8:22 p.m.: "Cum on I am waitin on u"

To Brown at 8:23 p.m.: "ok.gve me 5min.im gttn it 2gthr nw"

11

To Brown at 8:25 p.m.:  "Hw do u wnt it. solid r n 2pcks"

From Brown at 8:26 p.m.:  "Ok hurry please"

From Brown at 8:29 p.m.:  "Solid u ready"

To Brown at 8:31 p.m.:  "Yeah meet me on austin&5th by st. joseph"

To Brown at 8:34 p.m.:  "U wil c me on 5th.tke a rght"

This exchange provides some evidence that Brown was to obtain the drugs from the person she was meeting who was in the Suburban and was using Edwards' telephone to communicate. The person using Edwards' telephone identified him- or herself as "Det"—a "street name," according to an officer's testimony, used by Detwonne Alexander. There is testimony from the officer who failed to capture the fleeing suspect in the Suburban, that the suspect matched Alexander's general appearance. The vehicle was registered in the names of Alexander and Edwards. The telephone used by the suspect in the Suburban belonged to Edwards.

Viewed as a whole, we conclude this evidence tends to connect Alexander to the alleged offense and therefore sufficiently corroborates the testimony of the accomplice, Brown. We overrule this point of error.

We affirm the judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     February 20, 2009
Date Decided:       March 11, 2009

Publish