**MODIFY AND AFFIRM and Opinion Filed November 14, 2024.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-23-00419-CR**

**MADISON MCDONALD, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F21-33495**

## OPINION

Before Justices Molberg, Breedlove, and Kennedy
Opinion by Justice Kennedy

A jury convicted appellant, Madison McDonald, of the capital murder of her daughter, A.H., by asphyxiation. Because the State did not seek the death penalty, the trial court assessed her punishment at confinement for life, without the possibility of parole, in the Correctional Institutions Division of the Texas Department of Criminal Justice. *See* TEX. PENAL CODE § 12.31(a)(2). In six issues, appellant challenges various evidentiary rulings and the jury's rejection of her insanity defense and claims jury charge error. We affirm the trial court's judgment as modified herein.

BACKGROUND

The record reveals that at the time of the offense, appellant had a documented history of mental illness with various diagnoses, including schizoaffective disorder, bipolar type; anxiety; and panic disorders, and she had been prescribed antipsychotic, antidepressant, and antianxiety medications. Her mental health conditions, on occasion, and especially when she was not medication compliant, caused her to experience paranoid delusions and auditory hallucinations.

## I. The Offense

On April 5, 2021, appellant intentionally caused the deaths of her daughters A.H. and L.M., by asphyxiation. A.H. was six years old and L.M. was almost two years old at the time of their deaths. The murders were prompted by appellant's delusions that her ex-husband (L.M.'s father), and others, including her mother, were part of a sex trafficking ring that was subjecting her daughters to child pornography and planning on selling them into sex slavery, and her desire to free them from such abuse.

After murdering her daughters, appellant walked into the Irving Police Department headquarters and placed a 9-1-1 call from the lobby and made a report of "child pornography and murder." When asked who was murdered, appellant responded "my children." She told the operator she sedated her children and smothered them to protect them from family members who were putting them in child pornography. A few minutes into the 9-1-1 call, police officers made contact

–2–

with appellant in the lobby of police headquarters. Appellant told the officers that her children were being sexually abused by her ex-husband and that she had filed reports, but nothing had been done. She stated that she would do anything to protect her children, including eliminating them and paying the price for the rest of her life. Appellant was arrested, and police officers were dispatched to appellant's apartment where they found the lifeless bodies of A.H. and L.M.

Irving Police Detective Adam Mayorga interviewed appellant the morning after she turned herself in. During the interview, appellant discussed her beliefs that her children were being sexually abused and conceded she had no proof of any abuse. She indicated that she believed she needed to protect her children and had no other choice than to end their lives because no one would believe or help her. She explained in detail what transpired on the day of the offense, including how she kept the children home from school, how she attempted to sedate them by putting various drugs in their food, how she smothered L.M. while rocking her, and how A.H. fought back a bit while she smothered her.

## II. Appellant's Relationships and Events Preceding the Murders

Appellant met A.H.'s father ("Timothy") in 2013 when they were both receiving treatment at a substance abuse center. They began dating and, shortly thereafter, appellant became pregnant with A.H. Appellant and Timothy's relationship ended in 2017, but they continued to amicably co-parent A.H. Appellant started dating L.M.'s father ("Chris") in June 2017. They married in

January of 2019, and L.M. was born shortly thereafter. In the spring of 2020, they separated, and appellant and her children moved into an apartment in Irving. Appellant initiated divorce proceedings in September 2020.

After her separation from Chris, appellant became extremely paranoid and made numerous accusations of abuse. She believed Chris was committing acts of abuse against her daughters and another daughter of his from a prior marriage, that he was involved in a sex trafficking conspiracy and would sell her daughters as sex slaves in Europe. She believed she and her daughters were being drugged, raped, and filmed, and that pornographic videos of her and her daughters were being posted on the Dark Web. Appellant also believed her apartment had been broken into, her computer had been hacked, her phone had been bugged, and her medications had been tampered with. She made several reports of her accusations to the Irving Police Department and Child Protective Services ("CPS"). They investigated and concluded her accusations lacked merit.

On November 14, 2020, after the Irving Police Department dismissed her complaints, appellant, still obsessing about sex trafficking and child pornography and now believing the Irving Police Department was part of the conspiracy, passed a note to a cashier at a Burger King stating "Call the FBI tip line, not the police. Tell them a woman and her two kids are in danger." She passed similar notes at another fast-food restaurant and at a Walmart store.

Then on November 15, 2020, appellant reported to the Irving Police Department that she had come home and seen a man run out of her apartment and into the apartment next door. Police officers investigated and concluded there had been no intrusion of her apartment. They believed appellant was suffering from a mental health crisis, and they referred her to the Irving Police Department's mental health unit.

On November 20, 2020, appellant drove around with L.M. in the car looking for FBI headquarters. As she did so, at varying times, she spoke with Timothy, her mother, and her grandmother. They believed appellant was having a manic episode. Appellant's mother called the Irving Police Department and made a report concerning appellant, and the department sent officers to A.H.'s daycare facility. When appellant arrived, the officers were waiting for her. They took her into protective custody, and she was involuntarily hospitalized at Parkland Hospital for ten days and then sent to Dallas Behavioral Health for inpatient treatment for a couple of weeks. CPS became involved, and A.H. was placed with appellant's mother and L.M. with Chris. After appellant was discharged from inpatient care, she participated in intensive outpatient treatment and appeared to be doing better and no longer exhibited symptoms of paranoia or mania. In February 2021, A.H. and L.M. were returned to appellant's care. Appellant and Chris's divorce was finalized on March 18, 2021, and the capital murders occurred a couple of weeks later.

### III.  The Indictment and Subsequent Proceedings

On June 14, 2021, appellant was indicted for the capital murder of A.H.  The indictment alleged that on April 5, 2021, appellant unlawfully and intentionally and knowingly caused the death of A.H., who was under ten years of age at the time of the offense, by asphyxiating her with appellant's hand.  PENAL § 19.03(a)(8).  The indictment also contained an allegation of the use of a deadly weapon in connection with the offense.  The State later abandoned the deadly weapon allegation.

Appellant's competency to stand trial came into question.  The defense engaged Dr. Lisa Clayton, a forensic psychiatrist, to meet with appellant and to evaluate her competency.  Dr. Clayton first met with appellant in July 2021.  At that time, appellant was still experiencing paranoid delusions and auditory hallucinations, and Dr. Clayton concluded appellant was not competent to stand trial.  Thereafter, a jail psychiatrist increased the dosage on appellant's medications.  It appears that in early August 2021, the prosecutor handling the case notified defense counsel that the deadline for submitting Dr. Clayton's report had expired,[1] and then defense counsel approved of having Dr. Kristi Compton, a forensic psychologist, conduct a new competency evaluation.  Dr. Compton met with appellant and determined that she was competent to stand trial.  Thereafter, on December 2, 2021,

---

[1] *See* TEX. CODE CRIM. PROC. art. 46C.105(a) ("A written report of the [competency] examination shall be submitted to the court not later than the 30th day after the date of the order of examination. . . .").

–6–

Dr. Clayton met with appellant again and concluded appellant's competency had been restored and she was fit to stand trial.

Voir dire began in appellant's case on April 11, 2023, and a jury was impaneled. The trial on guilt–innocence began on April 12, with appellant pleading "not guilty by reason of insanity," having previously given notice she intended to present an insanity defense. The witnesses at trial included numerous law enforcement officers who were involved in the investigation of the murders of A.H. and L.M. or the investigation of appellant's various accusations of child pornography and sex trafficking; A.H.'s and L.M.'s fathers; medical examiners; appellant's mother; a psychiatrist who had been treating appellant prior to the murders; and Dr. Clayton and Dr. Compton, who testified as experts on the insanity issue.[2] Numerous exhibits were admitted into evidence, including the recordings of appellant's 9-1-1 call, her conversations with police officers in the lobby of police headquarters, and her interview with the lead investigator. In addition, the insanity evaluation reports of Dr. Clayton and Dr. Compton were admitted into evidence. On April 19, the jury returned its verdict rejecting appellant's claim of insanity and finding her guilty of capital murder. On the same day, the trial court rendered a judgment convicting appellant of capital murder and imposing a life sentence

---

[2] The testimony that is relevant to the issues raised by appellant will be discussed in our analysis of the issues.

without the possibility of parole, as required by statute. *See* PENAL § 12.31(a)(2). This appeal followed.

**DISCUSSION**

## I.     Insanity Defense

In her first issue, appellant challenges the factual sufficiency of the evidence supporting the jury's rejection of her insanity defense. She contends that she offered sufficient evidence in support of her insanity defense and the State offered insufficient evidence to rebut same and, consequently, the jury's rejection of her affirmative defense was against the great weight and preponderance of the evidence. *See Matlock v. State*, 392 S.W.3d 662, 670 n.29 (Tex. Crim. App. 2013) ("Technically, a defendant's claim is not one of 'factual sufficiency.' . . . The defendant is claiming that his evidence is more than sufficient to support his affirmative defense, while the State's evidence is insufficient to rebut it."). The State responds urging appellant's factual sufficiency challenge lacks merit.

### A.  Standard of Review

In *Matlock v. State*, the Texas Court of Criminal Appeals, citing its decision in *Meraz v. State*, 785 S.W.2d 146, 149, 153–55 (Tex. Crim. App. 1990), discussed the standard of review for factual sufficiency challenges to the rejection of an affirmative defense of insanity. 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). The court noted that in *Meraz*, it adopted the civil standards of factual-sufficiency review for challenges to the rejection of an affirmative defense because the burden of proof

–8–

is that of preponderance of the evidence, the same burden applied in civil proceedings. *Id.* The court further explained that, in the factual-sufficiency review of a rejected affirmative defense, an appellate court views the entirety of the evidence in a neutral light, but it may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony. *Id.* Therefore, an appellate court may sustain an appellant's factual-sufficiency claim only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Id.* If an appellate court determines that the evidence supporting an affirmative defense so greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, then the court may reverse the trial court's judgment and remand for a new trial. *Id.* at 672.

### B. Applicable Law

The law presumes that the accused is sane, and a criminal defendant asserting the affirmative defense of insanity bears the burden of proving by a preponderance of the evidence that he is insane. *Martinez v. State*, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993); *see also Ruffin v. State*, 270 S.W.3d 586, 591 (Tex. Crim. App. 2008) ("Texas law . . . presumes that a criminal defendant is sane and that he intends the natural consequences of his acts."). To establish the affirmative defense of insanity,

–9–

the defendant must prove "that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." PENAL § 8.01(a). In the context of the insanity defense, the word "wrong" means illegal. *Ruffin*, 270 S.W.3d at 592. If the accused knows that his conduct is "illegal" by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified. *See id*. Thus, proof of a mental disease or defect alone is not sufficient to establish an affirmative defense of insanity. *Schuessler v. State*, 719 S.W.2d 320, 329 (Tex. Crim. App. 1986) (op. on rehearing), *overruled on other grounds by Meraz*, 785 S.W.2d at 154; *Nutter v. State*, 93 S.W.3d 130, 132 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

While expert testimony may be helpful to a jury in a case where an insanity defense has been raised, the issue of insanity is not strictly medical; it also invokes both legal and ethical considerations. *Graham v. State*, 566 S.W.2d 941, 948–49 (Tex. Crim. App. 1978). It is the jury that makes the ultimate decision concerning sanity because only the jury can join the non-medical components that must be considered in deciding the ultimate issue. *Id.* at 949. It is within the jury's province to not only determine the credibility of witnesses and the weight of the evidence but also to determine the limits of the insanity defense itself. *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994) (citing *Graham*, 566 S.W.2d at 952), *overruled in part on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); *see also Reyna v.*

–10–

*State*, 116 S.W.3d 362, 367 (Tex. App.—El Paso 2003, no pet.) ("The issue of insanity at the time of the offense lies within the province of the jury, and we will overturn its decision only where insanity is undisputed or resolved to one end of the spectrum outside the realm of discretion.").

In determining the mental state of the accused at the time of the commission of the offense, the circumstances of the crime itself are important, and a jury may consider the defendant's demeanor before and after committing the crime, the defendant's attempts to conceal incriminating evidence or elude law enforcement, the defendant's expressions of regret or fear of consequences of his actions, and any other possible explanations for the defendant's actions. *See McAfee v. State*, 467 S.W.3d 622, 637 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (citing *Graham*, 566 S.W.2d at 951); *see also Torres v. State*, 976 S.W.2d 345, 347–48 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.).

### C. Analysis

Here, appellant argues she should be excused from punishment for capital murder because she acted under the influence of an extreme, severe mental disease or defect that prevented her from comprehending that her conduct was wrong and criminal. She urges the "did not know that his conduct was wrong" language in Section 8.01(a) of the Texas Penal Code can reasonably be given a broader meaning than "prohibited by law." While we commend appellant's counsel for his vigorous advocacy on behalf of appellant and cogent arguments, to accept his position, which

–11–

is based primarily on policy arguments, we would have to expand the scope of the insanity defense and employ a subjective, rather than an objective test.[3] This we cannot do. Rather, we are bound to apply the standard set forth in *Ruffin*. *Ruffin* dictates that the question for deciding insanity is "[d]oes the defendant factually know that society considers [the conduct at issue to be] against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified." *Ruffin*, 270 S.W.3d at 592. In resolving appellant's factual sufficiency challenge, the correct standard of review is whether, after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Matlock*, 392 S.W.3d at 671.

Both parties agree, and the record before us clearly establishes, appellant was suffering from mental illness at the time of the murders. Thus, the issue presented here is whether the jury's decision was manifestly unjust that appellant failed to establish by a preponderance of the evidence that she did not factually know that society considered killing A.H. to be against the law.

---

[3] *See Ruffin*, 270 S.W.3d at 592 (question for deciding insanity is whether the defendant factually knew society considers the conduct in question to be against the law, even though defendant, due to his mental disease or defect, may think that the conduct is morally justified); *see also, e.g.*, *United States v. Ewing*, 494 F.3d 607, 621 (7th Cir. 2007) (insanity defense under federal statute is defined by reference to objective societal or public standards of moral wrongfulness, not the defendant's subjective personal standards of moral wrongfulness).

The jury was presented with conflicting expert testimony concerning this issue. Dr. Clayton, the defense's expert, testified that appellant suffers from schizoaffective disorder, bipolar type, a mental disorder that is a combination of schizophrenia and bipolar disorder. A person with this disorder experiences schizophrenic symptoms such as auditory hallucinations, delusions, obsessions, ideas of reference, and disorganized thinking, as well as bipolar symptoms such as mania, depression, and insomnia. These symptoms can be treated effectively with antipsychotic and antidepressant medications. Dr. Clayton stated that, in the year prior to the offense, appellant had told several people that she believed she and her children were being exploited by Chris and her mother as part of a child pornography and sex trafficking ring, and she had tried to get help from multiple people and agencies without success. Dr. Clayton testified appellant reported to her that, at the time of the offense, she had not been sleeping and the voice of "Mark," a claimed alter ego, told her that the only way to save her children was to send them to heaven. According to Dr. Clayton, appellant believed that she could send her daughters to heaven and, once she exposed the child pornography ring, God would send them back to her. Dr. Clayton stated she believed appellant had a delusional belief that her children were not permanently dead. She further indicated appellant relayed to her that she thought she could go to the police and tell them what was happening, and she would not be charged with having committed a crime and the police would fix things for her. Based on the statements appellant made to Dr. Clayton during her

evaluations of her, Dr. Clayton concluded appellant did not know her conduct was wrong at the time she killed A.H. and thus she met the legal criteria for insanity.

On the other hand, Dr. Compton concluded that, while appellant was suffering from psychosis at the time of the offense, she retained the capacity to understand that her actions were wrong and would result in legal sanctions and, thus, she did not meet the legal criteria for a finding of not guilty by insanity. Dr. Compton's conclusion was based on the fact that appellant went to the police station and turned herself in. She explained that by doing so appellant indicated an awareness and knowledge of having committed a crime. In addition, Dr. Compton explained that her opinion was based on the statements appellant made during her 9-1-1 call immediately following the murders and her interview with detectives the next day, which showed sufficient awareness of the criminal wrongfulness of her behavior.

In the face of these conflicting expert opinions concerning appellant's awareness of the wrongfulness of her conduct, the jury was free to reject Dr. Clayton's opinion and accept Dr. Compton's opinion. *See Graham*, 566 S.W.2d at 950–951.

Moreover, the testimony of the expert witnesses was not the only evidence bearing on the insanity issue. Recordings of appellant's 9-1-1 call, appellant's interaction with officers in the lobby of the police station, and appellant's interview with detectives were admitted into evidence and published to the jury. In viewing and listening to these recordings, the jury was able to observe appellant's demeanor

following the murders of her daughters and to hear various statements she made that bear on the issue of insanity.

During the 9-1-1 call, appellant told the operator that she was calling about "child pornography and murder" and indicated that she sedated and smothered her children to protect them from family members who were putting them in child pornography. When officers entered the lobby of police headquarters, appellant told them that her children were being sexually abused by her ex-husband, that she had reported the abuse, but nothing had been done, and she would do anything to protect her children, including eliminating them. During her interview with Detective Mayorga, appellant made several statements showing that, despite being delusional and likely experiencing auditory hallucinations, she had sufficient awareness and knowledge that taking the lives of her children was legally wrong and would result in legal sanctions. Among those statements were the following:

> "I felt like I did what I had to do to protect my kids and it was not what I wanted to do. I don't—I'm not okay with it. I don't think that it's right. I think I do deserve to be arrested and serve time."

> "And you know, after I hurt them—it's hard to say that I killed them, I know I did, but . . . [sobs]. After I hurt them, I wanted to just hurt myself, but I thought I've gotta have one last chance, I've gotta go talk to someone and I've got to admit what I did [] to make it right. Because I do understand morals and values and ethics and respecting, and I mean I get right from wrong."

> "You know what I mean, like I knew I would spend the rest of my life in prison."

–15–

"Okay, well I'm gonna preface with this, first off, this is now a mental health crisis because I have murdered my children, okay?"

"I put some page—I was in a hurry, was trying to get here so I could turn myself in—but I put some pages from some old bank statements in there so you could get some basic information."

"I'm—this is—this has killed me it's taken my soul. And I just think now it's time for me to serve my time."

"Some days I feel like I just have depression and that life is getting me and then some days like today I feel like something's wrong. But I also did just kill my children."

"Well, I meant that as like I'm not—I don't believe I was in a form of psychosis or anything when I did it because I'm aware that it was wrong."

"This is the most overwhelming thing I've felt or will ever feel and I feel like I'm gonna live the rest of my life knowing that everyone's gonna be labeling me as a murderer and that's hard. Capital murder at that, even though I don't exactly understand the difference."

"I'm assuming capital murder is a life sentence?"

Appellant's statements immediately following the murders of her daughters are sufficient evidence upon which the jury could have reasonably relied to conclude that at the time of the offense appellant understood her conduct was against the law and to reject her insanity defense.[4] *See, e.g., Collins v. State*, No. 01-22-00487-CR, 2023 WL 8814633, at *9 (Tex. App.—Houston [1st Dist.] Dec. 21, 2023, no pet.) (mem. op., not designated for publication) (sufficient evidence to support rejection

---

[4] During the police interview, appellant never mentioned hearing the voice of "Mark" telling her she needed to save her children, nor did she report believing that her children were temporarily dead.

of insanity defense where appellant acknowledged he intended to kill people he believed were harming his daughter and that killing a person is illegal and could result in incarceration); *Delacruz v. State*, No. 05-12-01354-CR, 2014 WL 223174, at *9–10 (Tex. App.—Dallas Jan. 21, 2014, no pet.) (not designated for publication) (upholding jury's rejection of insanity defense when there were conflicting expert opinions on the subject and jury viewed video of police interview conducted hours after the shooting, in which appellant stated what she had done was wrong).

Appellant's argument she thought she would not be charged with a crime does not equate to a lack of knowledge that the conduct was illegal. Rather, it is an argument that she believed she was justified in taking the action she did and that others would likewise perceive she acted to protect her children and might decide not to charge her with a crime. Moreover, appellant's assertion she did not think she would be charged with a crime conflicts with the statements she made to law enforcement immediately following the murders. With respect to appellant's assertion that she believed her children were only temporarily dead, the jury could have concluded that this assertion was not credible because appellant did not assert it immediately following the murders and only raised it a considerable time later and in connection with her insanity evaluations and defense.

Appellant has not established the jury's rejection of her insanity defense was so against the great weight and preponderance of the entire body of admitted evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 670 n.29, 671. We

–17–

therefore hold the evidence was factually sufficient to support the jury's decision. We overrule appellant's first issue.

## II.    Jury Charge

In her second issue, appellant asserts the trial court erred by failing to instruct the jury on the State's burden of proof.   More particularly, while appellant acknowledges that, with respect to the State's burden of proof, the court instructed the jury, "The State must prove, beyond a reasonable doubt, the accusation of capital murder," she contends the court erred by not including a clear instruction on what to do if the jury finds reasonable doubt exists.   Appellant acknowledges that she did not object to the jury charge on this basis or request a specific instruction regarding same below but urges this issue can be reviewed on appeal under the egregious harm standard.[5]  *See Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984).

### A. Standard of Review

When reviewing alleged charge errors, we first determine whether error actually exists in the charge, and if we determine error exists, we determine whether sufficient harm resulted therefrom to require reversal.  *Abdnor*, 871 S.W.2d at 731–32.  The standard to determine whether sufficient harm resulted from the charging error to require reversal depends upon whether the appellant objected to the error in

---

[5] At trial when asked for objections and special requests from the defense regarding the jury charge, defense counsel requested instructions on manslaughter and criminally negligent homicide.  Appellant does not assert on appeal that the trial court erred in denying these requests.

–18–

the trial court. *Id.* Where there has been a timely objection to the error in the trial court, we search only for some harm. *Id.* Where the error is urged for the first time on appeal, we search for egregious harm. *Id.*

**B. Applicable Law**

The trial court submits a charge that distinctly sets forth the law applicable to the case. TEX. CODE CRIM. PROC. art. 36.13, 36.14; *Alcoser v. State*, 663 S.W.3d 160, 164 (Tex. Crim. App. 2022). The charge is meant to inform the jury of the applicable law and how to apply it to the facts of the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).

**C. Analysis**

Appellant contends the trial court should have included the following language from *Geesa v. State* in the jury charge; "In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit [her] and say by your verdict 'Not guilty.'" 820 S.W.2d 154, 162 (Tex. Crim. App. 1991), *overruled in part by Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000). The State responds asserting the trial court properly instructed the jury in this regard.

Immediately after instructing the jury, "if you find from the evidence beyond a reasonable doubt that on or about April 5, 2021 . . . [appellant] did unlawfully then and there intentionally or knowingly cause the death of A.H. . . . then you will find [appellant] guilty of capital murder[,]" the jury charge instructed "[u]nless you so

–19–

find from the evidence beyond a reasonable doubt, you will acquit the defendant and say by your verdict 'Not Guilty.'" Thus, contrary to appellant's assertion, the jury was instructed that if it did not find beyond a reasonable doubt that appellant committed the offense of capital murder, as charged, it should acquit her and enter a not guilty verdict. Thus, appellant has failed to establish the error she asserts. We overrule appellant's second issue.

## III. Evidentiary Rulings

### A. Evidence of the Murder of L.M.

In her third issue, appellant argues the trial court deprived her of a fundamental right by allowing the State to introduce evidence of the murder of L.M. when she was charged in this case with causing only the death of A.H. The State responds urging the capital murder of L.M. was so intertwined with the State's proof of the charged offense that it formed an indivisible criminal transaction and evidence of same was properly admitted as same-transaction contextual evidence.

#### 1. Applicable Law

Evidence of extraneous offenses is not admissible at the guilt–innocence phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character. TEX. R. EVID. 404(b)(1). However, extraneous-offense evidence may be admissible when it has relevance apart from character conformity. *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). For example, it may be admissible to show proof of motive, opportunity, intent,

–20–

preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b)(2). Extraneous-offense evidence may also be admissible for purposes other than those expressly listed in Rule 404(b)(2). Such evidence may be admissible as same-transaction contextual evidence, which has been defined as evidence of other offenses connected with the offense charged. *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000); *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). Same-transaction contextual evidence may be admissible where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony . . . of any one of them cannot be given without showing the others." *Rogers*, 853 S.W.2d at 33. "[E]vents do not occur in a vacuum, and the jury has a right to hear what occurred immediately prior to and subsequent to the commission of that act so that it may realistically evaluate the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). As such, the facts and circumstances surrounding the commission of an offense are relevant and necessary for the jury to have a complete picture of what occurred. *See Burks v. State*, 876 S.W.2d 877, 900 (Tex. Crim. App. 1994).

### 2. Standard of Review

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Moses*, 105 S.W.3d at 627. Thus, a trial court's ruling on the admissibility of extraneous

–21–

offenses is reviewed under an abuse-of-discretion standard. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005); *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. *Prible*, 175 S.W.3d at 731; *Santellan*, 939 S.W.2d at 169. A trial court's Rule 404(b) ruling admitting evidence is generally within this zone if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). If the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed, even if the trial judge gave the wrong reason for his correct ruling. *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982).

### 3. Analysis

In this case, the majority of the evidence regarding the capital murder of A.H. included evidence regarding the capital murder of L.M. Appellant's statements to the 9-1-1 operator, to the officers in the lobby of police headquarters, and to the detectives during her post-arrest interview referenced the murder of both of her children and, aside from a brief description of how she smothered L.M. while she rocked her, did not in any significant way distinguish between the two children. Thus, while the murder of L.M. was a separate offense, it was blended and interwoven with the murder of A.H. and admissible as same-transaction contextual evidence. *See, e.g.*, *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993)

(although kidnapping and murder of victim's wife and son were separate offenses they were blended and interwoven, and admissible to illuminate the nature of the crime alleged).

From the record before us, we conclude the trial court did not abuse its discretion in admitting evidence of the murder of L.M.  It was within the zone of reasonable disagreement to find the murder of L.M. to be same-transaction contextual evidence.  Accordingly, we overrule appellant's third issue.

## B. Testimony of A.H.'s Father

In her fourth issue, appellant urges the trial court abused its discretion by prohibiting her from eliciting from A.H.'s father his opinion and knowledge of her state of mind.  The State responds urging the trial court did not abuse its discretion by excluding lay testimony regarding the ultimate issue of appellant's insanity at the time of the offense and, in any event, any error in excluding same was harmless.

### 1.  Standard of Review

We review the trial court's decision to admit or exclude evidence under an abuse-of-discretion standard.  *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010).  The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or principles.  *Lyles v. State*, 850 S.W.2d 497, 502 (Tex. Crim. App. 1993).  The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement.  *Martinez,* 327 S.W.3d at 736.

–23–

## 2. Applicable Law and Application of Same

The trial court permitted the defense to elicit testimony from A.H.'s father that appellant's actions on the day of the offense were "not her," that the appellant he knew would not have done this, and that appellant is mentally ill and needs treatment.[6] The trial court excluded only A.H.'s father's ultimate opinion on whether appellant met the legal criteria for insanity. The defense did not attempt to elicit from A.H.'s father testimony as to whether appellant knew her conduct was wrong at the time of the offense, and the testimony appellant elicited from A.H.'s father was not time specific. *See Ruffin*, 270 S.W.3d at 592; *Nutter*, 93 S.W.3d at 132 ("[E]xistence of a mental disease, alone, is not sufficient to establish legal

---

[6] The exchange between appellant's trial counsel and Timothy in this regard was as follows:

Q. You know that [Appellant] loved the girls and that she was a great mom.
A. Yes.
Q. You believe that she had mental health demons that took over.
A. Yes.
Q. You know that what happened that night was not the real [Appellant].
A. Yes.
Q. You believe she is mentally ill not a monster.
A. That's correct.
Q. Is that correct?
A. That's correct.
Q. You believe that any logical person can tell that she is seriously struggling with mental health and needs treatment.
A. That's correct.
Q. You wrote to her that, "You are not a monster. I can't stress this how important you believe it. You have and had serious mental health problems. What happened wasn't the real Maddy. I know that wasn't the real Maddy 100 percent in my heart."
A. Yes.
Q. You told her that you think the correct place for her is a mental health facility and not jail.
A. For life, yes.
Q. You told the prosecutors that this was not her.
A. That's correct.
Q. And that [Appellant] you know would not be capable of doing this.
A. Yes.

–24–

insanity; rather, the accused must have been mentally ill at the time of the offense to the point that he did not know his conduct was wrong.").

Rule 701 allows opinion testimony by a lay witness, but only if it is helpful to a clear understanding of his testimony or the determination of a fact in issue. TEX. R. EVID. 701. The specific opinion appellant attempted to elicit from A.H.'s father lacked factual support and was thus conclusory and called for speculation on A.H.'s father's part as to appellant's mindset at the time of the offense. An opinion that lacks factual support or calls for speculation, such as the opinion appellant attempted to elicit from A.H.'s father, does not help the jury to either understand the witness's testimony better or decide the question of appellant's mental state. *See, e.g.*, *Fairow v. State*, 920 S.W.2d 357, 361–62 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 943 S.W.3d 895 (Tex. Crim. App. 1997) (speculative opinion about what someone else was thinking at a specific time does not assist jury). Mere conjecture does not assist the jury.

Because the testimony appellant sought to elicit from A.H.'s father concerning whether appellant met the legal requirement for insanity would not have assisted the jury, we conclude the trial court did not abuse its discretion in excluding A.H.'s father's testimony concerning same. We overrule appellant's fourth issue.

## IV. Photographs

In her fifth issue, appellant asserts the trial court erred by allowing the State to publish photographs of A.H. and L.M. during the State's presentation of Detective

–25–

Mayorga's testimony. She contends doing so did not serve any purpose other than to evoke sympathy for the two girls and inflame the passion of the jury.

Prior to trial, appellant objected to photographs of A.H. and L.M. while they were alive being displayed during the entire trial. The State agreed that it would publish the photographs when admitted and ask for permission to re-publish them later during the trial as necessary. The photographs at issue were admitted into evidence without objection and published during the testimony of each of the children's fathers and then taken down. Prior to the testimony of Detective Mayorga and the playing of appellant's recorded police interview, the State requested permission to re-publish the photographs. Appellant objected, stating that allowing the State to display the living photographs during the testimony would serve only to prejudice the jury in an unfair nature. The trial court overruled appellant's objection.

Appellant cites no controlling authority holding the display of photographic exhibits such as these, that have already been admitted into evidence, is error. A trial court's inherent power includes broad discretion over the conduct of its proceedings. *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 199 (Tex. Crim. App. 2003) (orig. proceeding). This discretion extends to courtroom displays. *See Smith v. State*, No. 05-15-01191-CR, 2017 WL 462345, at *3 (Tex. App.—Dallas Jan. 31, 2017, pet. ref'd) (mem. op., not designated for publication) (citing *Alexander v. State*, 282 S.W.3d 143, 145 (Tex. App.—Texarkana 2009, pet. ref'd)); *see also Bothne v. State*, No. 03-05-00258-CR, 2008 WL 1911965, at *6 (Tex. App.—Austin

–26–

Apr. 30, 2008, pet. ref'd) (mem. op., not designated for publication) (no abuse of discretion by allowing State to prop up on counsel table an eight-by-ten photograph of homicide victim where it remained for at least two days).

Moreover, given the overwhelming evidence of appellant's guilt in this case, and the lack of any evidence that the display of the photographs inflamed the minds of the jury or otherwise unfairly prejudiced appellant, no harm resulted from the display of same. *See Bothne*, 2008 WL 1911965, at *6 (no evidence display of photograph inflamed minds of jury or otherwise unfairly prejudiced appellant).

We conclude the trial court did not abuse its discretion in allowing the State to re-publish the photographs of A.H. and L.M. during Detective Mayorga's testimony and that appellant was not harmed by the re-publication in any event. We overrule appellant's fifth issue.

## V. Expert Witness

In her sixth issue, appellant urges the trial court erred by allowing the State to use rebuttal evidence that was illegally obtained by the State's expert, Dr. Compton, in forming her opinion on the insanity defense. The State responds arguing that appellant's objection to Dr. Compton's testimony was untimely and her complaints on appeal do not comport with her trial objections.

### A. Background

On July 1, 2021, the defense's expert, Dr. Clayton, met with appellant for the purpose of determining whether appellant was competent to stand trial. Dr. Clayton

determined she was not, but her report was not timely filed so the prosecutor who was initially assigned to the case, on behalf of the State, requested—and the defense agreed—to have Dr. Compton conduct another competency evaluation. Dr. Compton met with appellant on August 10, 2021. At that time, appellant had been on medication consistently for several months. Dr. Compton determined appellant was competent to stand trial, and Dr. Clayton, upon re-examination of appellant, determined she had regained competency.[7]

On June 14, 2022, appellant gave written notice of her intent to raise an insanity defense at trial. On June 22, 2022, the State filed a motion for court-ordered insanity examination and report, pursuant to Article 46C.101(a) of the Code of Criminal Procedure, requesting that the court appoint Dr. Compton as a disinterested witness to examine appellant with regard to the insanity defense. *See* CRIM. PROC. art. 46C.101(a).[8] On June 23, 2022, the trial court granted the motion, and Dr. Compton conducted her insanity evaluation on August 3, 2022. Shortly before trial, appellant's trial counsel told the lead prosecutor that Dr. Compton had previously

---

[7] In her report dated August 10, 2021, Dr. Compton stated, "The State requested an evaluation to assess Ms. McDonald's competency to stand trial and/or if Ms. McDonald is a person with mental illness."

[8] Article 46C.101(a) provides:

> If notice of intention to raise the insanity defense is filed under Article 46C.051, the court may, on its own motion or motion by the defendant, the defendant's counsel, or the attorney representing the state, appoint one or more disinterested experts to:
>
> (1) examine the defendant with regard to the insanity defense; and
>
> (2) testify as to the issue of insanity at any trial or hearing involving that issue.

CRIM. PROC. art. 46C.101(a).

been the State's expert on the issue of appellant's competency. The lead prosecutor, who was not a prosecutor in this case when appellant was examined for competency to stand trial, made an inquiry and on April 5, 2023, confirmed to defense counsel that the prosecution, not the court, had previously retained Dr. Compton to examine appellant for competency. A jury was impaneled in this case on April 11, 2023, and trial commenced on April 12 and concluded on April 19. The record indicates that, on April 15, the defense filed a motion to suppress and disqualify Dr. Compton. The trial court addressed the motion on April 17. The defense urged Dr. Compton should be disqualified from testifying because she was not a disinterested expert, having previously been retained by the State in this case to conduct a competency examination, and she violated appellant's Fifth Amendment right by questioning appellant about her state of mind at the time of the offense during her competency evaluation of appellant. The trial judge indicated she could remedy the situation by disqualifying Dr. Compton and re-setting trial to allow a different expert to examine appellant with regard to her insanity defense or the parties could agree to proceed without expert witnesses on the issue of insanity. The defense indicated it would not agree to either proposal, and the trial court denied the motion.

### B. Preservation of Complaint

We begin with the threshold question of whether appellant preserved for appellate review her complaints concerning the trial court's ruling on her motion to suppress. As a prerequisite to presenting a complaint for appellate review, a party

must have made a timely request, objection, or motion to the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. TEX. R. APP. P. 33.1(a)(1)(A). To preserve the complaint, the record must show the trial court either (A) ruled on the request, objection, or motion, either expressly or implicitly, or (B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal. TEX. R. APP. P. 33.1(a)(2). In addition, the party's complaint on appeal must comport with the complaint made at trial to be preserved. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009).

### 1. Timeliness of Complaint

By April 5, 2023, at the very latest, defense counsel was aware that the State, and not the court, retained Dr. Compton to conduct a competency evaluation of appellant in August 2021 and knew trial was set to commence a week later. Yet, defense counsel did not seek to disqualify Dr. Compton as an expert on the issue of insanity until April 15, well into the trial. As the trial judge suggested during the hearing on appellant's motion, had appellant raised the issue earlier, the court could have appointed a different expert to examine appellant prior to trial. Because appellant had the opportunity to, and did not, object to Dr. Compton's being an expert witness at a time when the trial court and the State could have corrected the purported error, she failed to preserve her complaint for review. *See Loredo v. State*, 159 S.W.3d 920, 923 (Tex. Crim. App. 2004).

–30–

## 2. Complaint on Appeal to Comport with Complaint Below

Even if appellant's motion had been timely, her complaints here do not comport with her complaints in the trial court. At trial, appellant argued that Dr. Compton violated her Fifth Amendment right during the initial competency evaluation by asking about her mental state at the time of the offense and that Dr. Compton was not a disinterested expert and, thus, should not have been appointed by the trial court to conduct an insanity evaluation pursuant to Article 46C of the Code of Criminal Procedure. On appeal, appellant argues Dr. Compton's opinion regarding insanity was "illegally obtained" because unbeknownst to defense counsel Dr. Compton was acting as an agent of the State when she conducted the competency and insanity evaluation, and her testimony should have been excluded pursuant to Article 38.23(a) of the Code of Criminal Procedure and Texas Rule of Evidence 703. Article 38.23(a) provides, "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." CRIM. PROC. art. 38.23(a). Rule 703 provides, "An expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." TEX. R. EVID. 703. More particularly, appellant contends Dr.

–31–

Compton illegally obtained information used in reaching her conclusions about appellant's sanity because, unbeknownst to trial counsel, she was acting as an agent of the State and gained access to appellant through the ruse of acting independently of the State and, consequently, her testimony should have been excluded pursuant to Article 38.23(a) and Rule 703.

In order to preserve a complaint on appeal, the appellant must have objected in the trial court on the same ground she raises on appeal and obtain a ruling on same. TEX. R. APP. P. 33.1(a). When a trial objection does not comport with the issue raised on appeal, nothing is preserved for review. *Id.*; *Pena*, 285 S.W.3d at 464. Because appellant did not seek to exclude Dr. Compton's testimony under Article 38.23(a) or Rule 703 in the trial court, she has not preserved the complaints she raises on appeal for review.

### 3. No Harm

We are deeply troubled with the process by which Dr. Compton came to conduct the insanity evaluation and the district attorney's office's handling of the matter. We nevertheless conclude that even if appellant preserved her current complaints for review and even if the trial court abused its discretion in denying her motion, appellant has nevertheless failed to demonstrate that she was harmed by such ruling. *See* TEX. R. APP. P. 44.2(b); *Hernandez v. State*, 176 S.W.3d 821, 824 (Tex. Crim. App. 2005) (harm standard is whether the error in admitting the evidence had a substantial and injurious effect or influence in determining the jury's verdict).

–32–

When a defendant introduces or plans to introduce an insanity defense and is examined by his own mental-health expert to support his claim, he waives his Fifth Amendment privilege against self-incrimination for the purpose of rebutting the defense. *Polvon v. State*, 682 S.W.3d 651, 660–61 (Tex. App.—Eastland 2024, pet. ref'd). When this waiver applies, the trial court may order the defendant to submit to examination by the State's mental-health expert about the details of the charged conduct to rebut his insanity defense. *Id.* at 661. Thus, even if the State's earlier retention of Dr. Compton to conduct a competency evaluation of appellant made her an interested expert and disqualified her from being appointed as a disinterested expert pursuant to Article 46C.101 of the Code of Criminal Procedure, the State was still entitled to present a rebuttal witness. *See id.* (applying *Lagrone v. State*, 942 S.W.2d 602, 609–12 (Tex. Crim. App. 1997), to insanity defense).[9]

We recognize that here, the trial court was asked to appoint Dr. Compton pursuant to Article 46C.101 and not pursuant to a motion by the State requesting that appellant submit to an interview by the State's expert in order to prepare for possible rebuttal testimony. To the extent such a separate motion would have been required, we conclude the lack of same was harmless because the evidence concerning appellant's awareness of the wrongfulness of her actions at the time of the offense

---

[9] In *Lagrone*, the court of criminal appeals held trial courts are allowed to "order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, *or plans to introduce*, its own future dangerousness expert testimony." 942 S.W.2d at 611 (emphasis in original).

was overwhelming, the most compelling of which were the statements she made to the 9-1-1 operator and to the police immediately after the murders. The jury could have based its decision on appellant's insanity defense on appellant's statements alone. We conclude any error in appointing Dr. Compton as an expert pursuant to Article 46C.101(a) of the Code of Criminal Procedure did not have a substantial and injurious effect or influence in determining the jury's verdict. Thus, to the extent the trial court's ruling on appellant's motion to suppress was in error, it was harmless.

For the foregoing reasons, we overrule appellant's sixth issue.

## VI. Modification of Judgment

By cross-issue, the State asserts the judgment should be modified to reflect appellant's plea of not guilty by reason of insanity. The Code of Criminal Procedure requires that the judgment accurately reflect the plea of the defendant to the offense charged. *See* CRIM. PROC. art. 42.01(3). The portion of the judgment entitled "Plea to Offense" states that appellant pleaded "guilty"; however, the record reflects that appellant pleaded "not guilty by reason of insanity." We have the power to correct and modify the trial court's judgment to make the record speak the truth when we have the necessary information to do so. *See* TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) (en banc). Accordingly, we modify the trial court's judgment to replace "guilty" with "not guilty by reason of insanity" in the "Plea to Offense" portion of the judgment.

–34–

Although not raised by either party, the trial court's judgment indicates there was a deadly-weapon finding. The record before us shows that, during trial, the State struck the deadly-weapon allegation from the indictment and the issue of whether the offense involved a deadly weapon was not submitted to the jury. This Court has the authority to modify the judgment to make the record speak the truth and may do so sua sponte. *See* TEX. R. APP. P. 43.2(b); *see also Asberry*, 813 S.W.2d at 529–30. Accordingly, we further modify the trial court's judgment by deleting "YES, NOT A FIREARM" under "Findings on Deadly Weapon" and replacing it with "N/A."

### CONCLUSION

We affirm the trial court's judgment as modified herein.

/Nancy E. Kennedy/
_____
NANCY KENNEDY
JUSTICE

230419f.p05

PUBLISH
TEX. R. APP. P. 47



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MADISON MCDONALD, Appellant

No. 05-23-00419-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District Court, Dallas County, Texas Trial Court Cause No. F21-33495. Opinion delivered by Justice Kennedy. Justices Molberg and Breedlove participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

by replacing "guilty" with "not guilty by reason of insanity" in the "Plea to Offense" portion of the judgment; and

by deleting "YES, NOT A FIREARM" under "Findings on Deadly Weapon" and replacing it with "N/A."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 14th day of November, 2024.